No. 37,215

W. G. TALBOTT, *Appellee,* v. CLAUDE A. NIBERT (also known as C.
A. NIBERT), *Appellant,* and PABCO DRILLING COMPANY, INC.,
*Appellee.*

(206 P. 2d 131)

Opinion filed May 7, 1949.

*Austin M. Cowan,* of Wichita, argued the cause, and *W. A. Kahrs* and *Robert H. Nelson,* both of Wichita, were with him on the briefs for the appellant.

*John F. Eberhardt,* of Wichita, argued the cause, and *Paul H. White, George Siefkin, George B. Powers, Samuel E. Bartlett, Andrew F. Schoeppel, Carl T. Smith, Stuart R. Carter, Thomas E. Woods,* and *Robert C. Foulston, Jr.,* all of Wichita, were with him on the briefs for the appellee.

The opinion of the court was delivered by

WEDELL, J.: This was an equitable action to compel one stockholder to comply with an option contract to sell to another stockholder in the same corporation shares of stock, after the plaintiff had exercised the option to purchase. The action was tried by the court without a jury. Judgment and special findings were all in favor of the plaintiff and the defendant appeals.

The Pabco Drilling Company, issuer of the stock, was made a party defendant for the purpose of giving it notice of the action and in order that a proper transfer of the stock might be effected. It was directed to issue the stock in question to plaintiff. The corporation is not appealing.

We shall hereafter refer to the appellee, W. G. Talbott, and to the appellant, Claude A. Nibert, by name, and to the company as the corporation.

A chronological statement of pertinent facts will be made first. Other facts, where necessary, will be treated under contentions of the parties. In 1946 the corporation was in bad financial straits. Its sole asset was a $40,000 drilling rig which was subject to a $23,-000 mortgage. The corporation had other debts and could not meet its obligations. At one time prior to the granting of the option contract in question to Talbott it seems D. J. Briggs, another stockholder, desired to acquire an option to purchase Nibert's twenty-eight shares of stock. Talbott had learned that certain parties, for whom the corporation had drilled, refused to do further business with it if Nibert was connected with its affairs. Talbott was a geologist and oil operator. He had various business interests and contracts with the oil industry. He refused to invest additional capital in the corporation and to give his time to its development unless he could acquire the majority of the stock and control the business policies of the corporation. The acquisition of Nibert's stock would give him that control. Under this state of facts Briggs concluded to confer with Nibert for the purpose of getting Nibert to grant Talbott an option to purchase Nibert's stock.

On October 29, 1946, Nibert gave Talbott a written option which read:

"For and in consideration of One Dollar, receipt of which is hereby acknowledged, and for other valuable consideration, I hereby grant and give W. G. Talbott, of Wichita, Kansas, an option for one year from this date to purchase the 28 shares of *Padco* Drilling Company stock which I own for the sum of $5,000.

"This option may be exercised at any time during the following year and if not taken up before October 28, 1947, same shall become null and void."

The option was witnessed by D. J. Briggs.

In December, 1946, the financial condition of the corporation required it to make a stock assessment. Nibert was unable to meet the assessment. In lieu thereof he surrendered five shares of his stock to the corporation in order to effect a release of the assessment lien on his stock covered by the option. At the time the corporate assessment was made Nibert and Talbott agreed the option price should be proportionately reduced as to Nibert's remaining twenty-three shares of stock, thereby reducing the option price to $4,107.34. On that basis each share was evaluated at $178.58.

Several conferences were had between Nibert and Talbott in which the value of the remaining twenty-three shares was discussed. At a conference for that purpose in January those present in addition to Nibert and Talbott were Briggs, Van Sickel, secretary of the corporation, and John Blood, a stockholder.

Later in January, 1947, Nibert inquired of Talbott whether Talbott was going to take up the option and not make him wait a year for his money. In the same month Nibert granted Talbott a written proxy to vote the twenty-three shares of stock. The option contract was never revoked by Nibert. It was recognized as being in full force and effect and had been modified by the agreement of the parties to reduce the shares covered by the option from twenty-eight to twenty-three in order to meet the stock assessment made in December, 1946. On June 9, 1947, Talbott exercised the option in writing and tendered $4,107.34 to Nibert, that being the value of the remaining twenty-three shares at $178.58 per share according to the agreement when the stock assessment was made.

Talbott's contacts with oil operators and business concerns had provided profitable drilling contracts for the corporation. He had personally paid off the $23,000 mortgage on the drilling rig. He had also procured drilling work for the corporation on leases in which he had an interest. The twenty-eight shares of stock at the time the

option was given in October, 1946, were worth $2,520 or $90 per share. Largely, if not entirely, by reason of Talbott's investment, his business contacts and ability the shares of stock had increased in value somewhat in excess of $7,000 or $250 per share by the time Talbott exercised the option on June 9, 1947. That valuation did not include some potential production of wells, the value of which was speculative.

The facts thus far stated do not appear to be disputed but if there was any contrary evidence the conflict was resolved in favor of the plaintiff, Talbott, by the general judgment and also by the special findings of the court, as will presently appear.

Although other defenses were originally pleaded by Nibert it was agreed by his counsel at the trial that only the following three issues remained for trial: (1) Nibert contended that prior to giving Talbott the option contract it was orally agreed that Talbott would not exercise it if Nibert refrained from interfering with the corporate management; (2) Nibert contended he had given the written proxy to Talbott to vote his stock with the previous oral understanding that if he gave it Talbott would not exercise the option; (3) in defense of Nibert's breach of the option contract he contended he was not compelled to comply with it for the reason that no notice had been given to other stockholders of the corporation concerning the sale of the stock to Talbott, which notice Nibert claimed the bylaws (it is agreed he meant charter) of the corporation required.

In response to an inquiry from the trial court counsel for Nibert conceded the burden of proof on those issues rested on Nibert. He accordingly assumed that burden and adduced his evidence first. Talbott demurred to that evidence. The demurrer was overruled. Talbott adduced his evidence. He had denied the alleged oral contract claimed by Nibert in No. 1 above and had objected to the competency of Nibert's evidence pertaining thereto. The objection was sustained and that point will be treated later. The trial court admitted evidence touching the alleged oral contract mentioned in No. 2 above. The evidence was conflicting. The trial court expressly resolved that conflict against Nibert. The court made findings of fact and conclusions of law in which all issues were resolved against Nibert, as follows:

"FINDINGS OF FACT.

"1. On or about October 29, 1946, defendant Nibert executed and delivered to the plaintiff a written option to purchase Nibert's 28 shares of stock in the Pabco Drilling Company for $5,000 on or before October 27, 1947.

"2. In December, 1946, five of Nibert's 28 shares of stock were canceled by general corporate assessment. At that time Nibert and Talbott agreed the option price should be proportionately reduced as to Nibert's remaining 23 shares of stock, thereby reducing the option price to $4,107.34.

"3. There was no agreement or understanding between Nibert and Talbott that in consideration of Nibert's granting Talbott a voting proxy in January, 1947, Talbott would not exercise the option. The option was never revoked by Nibert, but was still outstanding according to its terms on June 9, 1947 (except as modified by the December, 1946, agreement).

"4. On June 9, 1947, Talbott duly accepted Nibert's option-offer and exercised the option by written notice to Nibert.

"5. In October, 1946, 28 shares of stock in the Pabco Drilling Company were worth $2,520, or $90 per share. As of June 9, 1947, 28 shares of stock in said corporation were worth somewhat in excess of $7,000, or $250 per share. No evidence was introduced by which the Court can determine the approximate amount of such excess value and the Court refuses to find such shares were worth $10,000 to $15,000 at that time.

"6. It is equitable that the option contract be specifically enforced in accordance with its terms, and it would be inequitable to refuse to grant specific performance of said contract.

"7. The charter of the Pabco Drilling Company, Inc., contained the following provision:

" 'Statement of all or any of the designations and the powers, preferences and rights and the qualifications, limitations or restrictions thereof, in respect to any class (printed form to this point) stockholders of record shall have the prior right to purchase any stock offered for sale and any stockholder desiring to sell his stock in said corporation, or any part thereof, shall notify the President and Secretary in writing of his desire to sell, the number of shares and the price asked, and the Secretary on receipt of said notice shall immediately notify by registered mail, addressed to the last known address, or the address of record in the stock register, all stockholders of record, and any stockholder or stockholders desiring to purchase same may by exercising such rights purchase their prorata share of same within 30 days of the date of the notice given by said stockholder to the Secretary, and by depositing with the Secretary the amount of the price thereof, and upon failure of the stockholders or any of them to purchase same within said 30 days, said stockholder shall have the right to sell the same to any person.'

"8. No offer or notice of intent to sell Nibert's stock has ever been made to the other stockholders, nor has there been given an opportunity to purchase their proportionate share of such stock in accordance with the provisions of the charter above set forth."

"CONCLUSIONS OF LAW.

"1. The option contract of October 29, 1946, constituted a continuing offer by Nibert to Talbott to sell his stock in accordance with the terms of the option.

"2. The option-offer, as modified by the December, 1946, reduction of price, was never revoked, and was valid and outstanding on June 9, 1947.

"3. Upon acceptance of the option by Talbott on June 9, 1947, an enforceable contract arose whereby Nibert became obligated to sell his remaining 23 shares of stock in the Pabco Drilling Company to Talbott for $4,107.34.

"4. The contractual consideration was not inadequate, nor are there any facts or circumstances rendering it inequitable specifically to enforce the contract of purchase. On the contrary, it is equitable that the contract should be specifically enforced according to its terms.

"5. The charter provision imposing restrictions upon the sale of stock has no application to sales by one stockholder to another stockholder, and does not govern the sale by Nibert to Talbott.

"6. The Court resolves all issues of law in favor of the plaintiff, Talbott, and against the defendants, and finds that a judgment should be entered specifically enforcing the option contract according to the prayer in plaintiff's petition.

"7. Talbott shall pay to the Clerk of this Court the sum of $4,107.34 and Nibert shall thereupon endorse and deliver to Talbott his certificate or certificates representing his 23 shares of stock in the Pabco Drilling Company; whereupon the Pabco Drilling Company shall transfer said shares of stock to Talbott and issue to Talbott a new certificate therefor.

"8. The costs of this action shall be assessed against and paid by the defendant Nibert.

"9. Plaintiff has no adequate remedy at law."

The findings of fact are amply supported by the evidence.

Counsel for Nibert now contends the option contract was without consideration; the burden should have been placed on Talbott; that the burden was on Talbott to prove the adequacy of consideration for the option contract and to show it was equitable to enforce it; that Talbott, as president of the corporation, who was familiar with the corporate affairs was bound to exercise the greatest good faith towards Nibert, a stockholder, who was not familiar with the corporate affairs with respect to the value of the stock.

Touching the fiduciary relationship of the parties, last mentioned, we fail to find it was pleaded or raised below. In any event the record discloses the monthly records of the corporation were at all times available to all stockholders, including Nibert. Moreover, the evidence clearly shows the value of the stock was low at the time the option was granted; the consideration of $5,000 for the option contract was far in excess of the low value of the stock at the time the option was given; the value of the stock was again fully discussed by Nibert and Talbott, and others, at and immediately after the time the corporate stock assessment was made.

We have already stated the issues which were presented to the trial court and that Nibert assumed the burden of proof. As stated, this action was tried by the court without a jury. The question

of the burden of proof relative to the issues now raised by Nibert became quite immaterial after all the evidence was before the court. Assuming the burden of proof on other issues now raised by Nibert rested on Talbott, the evidence in the record abundantly supports the trial court's findings of fact.

The recited consideration for the option contract was not only "One Dollar" but in addition thereto was "other valuable considerations." It is conceded Talbott did not pay Nibert "One Dollar" at the time the option contract was executed. It is, however, evident the investment in money and services by Talbott, which was intended to and did increase the value of the stock to every stockholder, amply complied with the consideration mentioned in the contract, namely, "other valuable considerations."

Talbott performed for the benefit of Nibert as well as all other stockholders. Furthermore, even an option unsupported by initial consideration is, if accepted prior to its revocation, a binding obligation which may be enforced in equity. (49 Am. Jur., Specific Performance, §§ 117, 118.) To the same effect is *Connell v. Kanwa Oil Inc.,* 165 Kan. 241, 194 P. 2d 950, where we said:

"Where a party exercises an option by performance which benefits the other party the latter manifestly cannot repudiate the deal on the ground it was originally unilateral." (p. 243.)

Following, too, it is said in 12 Fletcher, Cyclopedia of Private Corporations, Perm. ed., 1932, § 5575:

"It is well settled that the owner of stock may give another an option to buy within a certain time, and if the other accepts and agrees to buy within the time limited, the offer not having been withdrawn, there is a binding contract, even though the option was originally without consideration, which may be enforced in equity." (p. 566 *et seq.*)

Here Nibert gave the option in order to get Talbott to save and revitalize the corporation. Nibert knew he would benefit by the resulting increased value of his stock if Talbott did not exercise the option. He undoubtedly also realized he might lose even the option value of his stock if he did not grant the option. These were all proper considerations which a court of equity could not well overlook. Assuming, therefore, the adequacy of the consideration for the option contract remained an issue for trial and that the burden of proof relative thereto rested on Talbott its adequacy is amply established by the evidence.

We agree the court correctly concluded there were no facts that

made it inequitable to decree specific performance of the contract and that, on the contrary, it was equitable to enforce it.

On what theory is this equitable conclusion assailed? Nibert contends there was failure of compliance with a condition required to make a valid sale of the stock. His contention, in substance, is that he was not required to comply with his contract for the reason the corporate charter provisions set forth in the court's findings of fact required a notice of his sale of stock to Talbott be given to the other stockholders of the corporation and that no notice was given in accordance with that provision. The trial court thought otherwise and concluded the charter provision did not apply to or govern a sale of stock from one stockholder to another stockholder. (Conclusion of law No. 5.) Assuming purely for the sake of argument that the provision did apply as Nibert contends and that it required such notice in the case of a sale by one stockholder to another stockholder in the same corporation, and assuming further, and again only for the sake of argument, that such a provision, if it existed, was valid, how could such facts possibly constitute a defense available to Nibert in this case? Who was required under this charter provision relied on by Nibert to initiate the proceedings to have such a notice given? It was Nibert, the seller of the stock, not Talbott, the purchaser.

The charter provision on which Nibert relies required *him* to "notify the president and secretary in writing of his desire to sell, the number of shares and the price asked. . . ." Only after Nibert had performed that alleged condition, or requirement, could the secretary of the corporation give the notice of sale to other stockholders. Even if Nibert's interpretation of the charter provision were correct it was he who, by his own default, prevented the completion of the transaction. We therefore find Nibert asserting his own default as a defense to a decree of specific performance.

Manifestly, Nibert's own default which prevented the completion of the transaction according to the charter, if it required notice, could not be asserted by him as a defense at law, much less in equity and good conscience. The only duty which would have remained for Talbott to perform in order to complete the transaction after the notice to stockholders, if such notice were necessary, would have been to pay for the stock he received. Nibert made it impossible for Talbott to perform that duty.

The rule is clear and well settled, and founded in absolute justice, that a party to a contract cannot prevent performance by another and derive any benefit, or escape any liability, from his own failure to perform a necessary condition. (*Dill v. Pope,* 29 Kan. 289; *Supply Co. v. Cement Co.,* 91 Kan. 509, 512, 138 Pac. 599; *Briney v. Toews,* 150 Kan. 489, 495, 95 P. 2d 355.) And this is the universal rule. (12 Am. Jur., Contracts, §§ 381, 386; 2 C. J., Agency, § 439, p. 772; 13 C. J., Contracts, §§ 721, 722, 723; Restatement, Contracts, § 315.)

In view of what has been said it is unnecessary to a decision in this case to determine (1) whether the charter provision in question applies to a sale of stock from one stockholder to another in the same corporation; (2) whether this charter was only intended to give stockholders priority to purchase in the event the stock was to be offered for sale to a nonstockholder; or (3) whether the charter provision constitutes an invalid restriction on the power of disposition if interpreted to apply to sales of stock by one stockholder to another in the same corporation.

Nibert is representing only himself in this case and no other stockholders. Clearly, he cannot personally escape the performance of his contract with Talbott under the guise of endeavoring at this late hour to protect the rights of other stockholders. If their rights have been impaired by reason of this transaction they can assert them by such a remedy as they deem advisable.

When Nibert refused to carry out his contract Talbott filed the instant action to compel performance by Nibert. Talbott directs attention to the fact that thereafter, and in order to indicate his good faith in the matter, he caused two letters to be written to the stockholders, informing them of the option contract and the pendency of the instant action to acquire the stock, offering to permit them to share pro rata in the purchase of the Nibert stock if they would also share in the expense of the litigation made necessary in order to acquire the stock, and that none of them deposited his pro rata share as provided by the charter. Nibert's counsel contend those notices and offers did not conform to the charter provision and were insufficient and improper for other stated reasons. A determination of these contentions of the parties would not affect the conclusion we have reached on the merits of the case and we shall not pursue them.

This brings us to a complaint concerning the exclusion of certain

oral testimony pertaining to the unqualified option which authorized Talbott to exercise it at any time within one year. Nibert contends the testimony he offered, that the option contract was given with the previous and contemporaneous oral understanding Talbott would not exercise it if he, Nibert, refrained from interfering with the corporate management, should have been admitted. The argument is that this evidence disclosed a conditional delivery, and was therefore competent, citing *Griffith v. Marsh*, 85 Kan. 693, 118 Pac. 879; *Stroupe v. Hewitt*, 90 Kan. 200, 133 Pac. 562; *Bartholomew v. Fell*, 92 Kan. 64, 139 Pac. 1016; *Goutermont v. Bland*, 99 Kan. 431, 162 Pac. 270; *Wilhoit v. Seavall*, 121 Kan. 239, 246 Pac. 1013; *Mayse v. Grieves*, 130 Kan. 96, 101, 285 Pac. 630. It will be observed the excluded oral testimony pertained to future performance of Nibert during the life of the option. It qualified the option by adding a new condition thereto and clearly changed its terms and legal effect. None of the cases cited supports the contention the oral testimony was competent.

It is also well to remember this option had been exercised. When exercised before revoked it became a binding contract as previously shown herein. The contract was eligible to protection of the parol evidence rule. (20 Am. Jur., Evidence, § 1105.)

The trial court properly excluded the testimony. (*Guaranty Co. v. Grabske*, 111 Kan. 271, 207 Pac. 322; *Hudson State Bank v. Haile*, 130 Kan. 322, 325, 286 Pac. 228; *Continental Supply Co. v. Morgan*, 133 Kan. 121, 298 Pac. 790; *Lanphear v. McLean*, 135 Kan. 266, 10 P. 2d 889; *Federal Farm Mortgage Corp. v. Bolinger*, 152 Kan. 700, 705, 108 P. 2d 492.)

This might well end the appeal. The trial court, however, passed squarely on the legal effect of the charter provision itself and we shall treat that point. At the outset, however, we desire to emphasize that we are concerned here solely with the instant charter provision and not with the abstract question of the validity of some provision of a wholly different character which all stockholders might have seen fit to adopt.

It is true the trial court found no notice of the sale had been given as required by the charter. The court could not have found otherwise on the evidence. That finding does not mean the sale was void. How can that finding possibly aid the seller, Nibert? Clearly it cannot. That finding is not against the purchaser, Talbott. It is a specific finding against Nibert whose duty it was to—

and who alone could—initiate the proceedings to give notice of the sale, if such notice was in fact required in the case of a sale from one stockholder to another.

It must not be overlooked the court's conclusions of law showed it expressly decided the charter provision did not apply to a sale of one stockholder to another and did not govern the instant case. If that be correct obviously no notice was necessary in order to make a valid sale, and the court so decided.

The trial court may have reached its conclusion that the charter provision had no application to the instant case on more than one theory. It may have reached that conclusion from its interpretation of the charter provision itself, or it may have reached that conclusion on the theory that if it was the intention of the charter to require notice in the case of a sale by one stockholder to another the requirement was void. The latter conclusion is squarely sustained by our own decision in *Steele v. Telephone Association,* 95 Kan. 580, 148 Pac. 661. It is not contended this court has overruled or modified that decision. It was there held such a requirement constituted an impairment of a stockholder's right to dispose of his own personal property, his stock, and was void.

It therefore follows the court's conclusion that the sale was valid was correct irrespective of the particular theory upon which the judgment was based. So long as a judgment is correct the theory or reason on which it is decided is wholly immaterial insofar as a reversal on appeal is concerned. See *Goodloe v. Jo-Mar Dairies Co.,* 163 Kan. 611, 612, 185 P. 2d 158, and numerous cases there cited.

But if the court's conclusion was based on the interpretation of the charter itself, was the trial court wrong in that interpretation? Obviously it was not. Notwithstanding the fact that some other courts uphold restrictive charter provisions, agreed upon by the stockholders, which require a notice of sale to all stockholders where one stockholder sells his stock to another stockholder, it is generally held the restrictive provision must specifically state that a notice is required under those particular circumstances. (*Guaranty Laundry Co. v. Pulliam,* 198 Okla. 667, 181 P. 2d 1007 [1947], and see numerous cases cited therein, p. 669.)

Restrictive charter provisions concerning sales of stock are ordinarily employed to keep the association intact and to prevent transfer of stock to "outsiders," nonstockholders, who might enter the corporation to gain information concerning it for their own sel-

fish ends and to use it against the best interests of the corporation. Such restrictive provisions pertaining to nonstockholders are valid. Absent a clear and specific charter provision which compels an interpretation that notice is required to other stockholders in case of a sale by one stockholder to another stockholder courts generally construe such provisions to mean that stockholders are to be given an opportunity to purchase the stock only before it is offered to "outsiders," nonstockholders. A few of the numerous cases so holding are *Rychwalski v. Milwaukee Candy Co.*, 205 Wis. 193, 236 N. W. 131; *Serota v. Serota*, 5 N. Y. S. 2d 68; *Gibbon v. 3920 Lake Shore Drive Building Corporation*, 310 Ill. App. 385, 34 N. E. 2d 109; *Mason v. Mallard Telephone Co.*, 213 Iowa 1076, 240 N. W. 671; *Sterling Loan & Investment Co. v. Litel*, 75 Colo. 34, 223 Pac. 753; *McDonald v. Farley & Loetscher Mfg. Co.*, 226 Iowa 53, 283 N. W. 261, 263.

The instant charter did not specifically or clearly deny the right of a stockholder to sell to another stockholder without notice to other stockholders. It is just as open, and it would seem far more so, to the interpretation that the priority referred to means that stockholders have a priority over outsiders to purchase the stock. The trial court, in view of the overwhelming weight of authority properly concluded the charter did not apply to or govern the instant sale.

In view of our own decision in the Steele case, *supra*, it is clear that in the absence of a contrary later decision, and we have none, or contrary legislation on the subject, the instant charter would be void if interpreted to require notice to all stockholders in case of a sale of stock by one stockholder to another stockholder. With the decision in the Steele case before the legislature what did that body do when it enacted the 1939 corporation code? The answer is clear. It provided that a charter might contain a provision denying the right of sale to *nonstockholders* before the stockholders had an opportunity to purchase. That legislation itself shows the legislature did not intend to disturb the decision in the Steele case but actually intended to conform its legislation thereto.

In G. S. 1947 Supp. 17-2802 the legislature provided what articles of incorporation should set forth. That statute is not drawn into question in this case. In G. S. 1947 Supp. 17-2803 the legislature stated what provisions *might be* set forth in the charter. Provisions thereof stressed by the parties are:

"The articles of incorporation may also set forth:

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"B. Any provision which the incorporators may choose to insert for the management of the business and for the conduct of the affairs of the corporation, and any provisions creating, defining, limiting and regulating the powers of the corporation, the directors and the stockholders, or any class of the stockholders, or, in the case of a corporation which is to have no capital stock, of the members of such corporation; provided, such provisions are not contrary to the laws of this state.

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"E. A provision to the effect that no stockholder of the corporation shall ever own, or vote as owner or by proxy, or both, to exceed a certain percent of the capital stock of such corporation.

"F. A provision reserving to the corporation and existing shareholders the right to purchase and acquire the stock of a selling stockholder before sale to a nonstockholder."

Nibert contends "B" empowered the corporation to enact a charter provision which would require an offer of the sale of stock to all stockholders before selling it to one or more stockholders. Assuming it would be possible to so interpret "B," with which we cannot agree, it already has been demonstrated the corporation did not enact a charter provision having that effect. We need, therefore, not discuss, in this case, the abstract question of the effect of a provision requiring notice if it had been enacted.

Talbott contends in any event "B" was not intended to cover this particular subject as "F" specifically pertains thereto and covers it precisely. The latter contention is sound. If "B," a section of general scope, had the effect contended for by Nibert it would permit a provision which would be contrary to and, therefore, nullify the specific provision permitted in "F." It is well established that a statute relating to a specific thing takes precedence over a general statute which might be construed to relate to it. (*Wulf v. Fitzpatrick,* 124 Kan. 642, 261 Pac. 838.)

The intent of the legislature must be ascertained by a consideration of all material portions of a statute or act and not from isolated portions thereof. (*Rausch v. Hill,* 164 Kan. 505, 508, 190 P. 2d 357.) It is the duty of courts, so far as practicable to reconcile various provisions in order to make them consistent and sensible. (*Iola B. & L. Ass'n v. Allen County Comm'rs,* 152 Kan. 365, 103 P. 2d 788.) Applying these rules of construction the legislative intent seems evident.

It is also well to note subdivision "E" of the above statute enables a corporation to enact a provision which would keep any stockholder

from owning or voting enough stock to control the corporate affairs. When the case was argued orally before this court we were advised this charter contained no such provision. Nibert had originally alleged the defense that Talbott was attempting to get control of the corporation and "freeze out" the minority stockholders. That defense was, however, withdrawn at the time of trial.

In our opinion the judgment of the trial court compelling specific performance of the instant contract was the only judgment which in justice and fair dealing could have been rendered.

The judgment is affirmed.

PARKER, J. (dissenting): My reasons for dissenting from the majority opinion will be stated as briefly as possible.

The parties concede and the trial court found (for the provisions in full see Finding of Fact No. 7 in the majority opinion) the articles of incorporation of the Pabco Drilling Company, Inc., provide, that stockholders of record shall have the prior right to purchase any stock of the corporation offered for sale; that any stockholder desiring to sell his stock in the corporation must give notice to the president and secretary in writing of his desire and intention to do so; that upon receipt of such notice the secretary must give notice to all other stockholders of such intention and that thereupon any stockholder or stockholders desiring to purchase such stock may purchase their pro rata share of the same within thirty days from the date of the secretary's notice.

The trial court also found by its Finding of Fact No. 8, which is unchallenged and therefore conclusive, that no offer or notice of intention to sell Nibert's stock had ever been made to the other stockholders and that they had not been given any opportunity to purchase their proportionate share of his stock as required by the articles of incorporation.

Thus at the very outset we are met by the proposition that if Talbott is to have specific performance of his option contract he gets that relief without complying with and in violation of express provisions of the corporate charter prescribing the conditions and circumstances under which he or any other stockholder might acquire additional stock in the corporation.

The trial court concluded as a matter of law (see Conclusion of Law No. 5) that the charter provisions imposing restrictions upon the sale of stock had no application to sales by one stockholder to

another stockholder and did not govern the sale by Nibert to Talbott. Obviously, since the involved provision expressly provides to the contrary in clear and unambiguous language which is not subject to any such interpretation this conclusion is based upon the premise that the restrictive provisions of such character in the articles of incorporation are invalid and therefore unenforceable. Talbott so contends. On the other hand, as I understand it, the majority opinion holds that questions pertaining to the validity of such restrictions or their force and effect, if valid, are immaterial and that the rights of the parties are determined by general principles governing contractural obligations between individuals, irrespective of and without regard to the charter's inhibitions. I cannot agree with either conclusion.

Since the enactment in 1939 of the general corporation code of this state our statute (G. S. 1947 Supp. 17-2803[B]) provides:

"The articles of incorporation may also set forth.

. . . . . . . . . . . . .

"B. Any provision which the incorporators may choose to insert for the management of the business and for the conduct of the affairs of the corporation, and any provisions creating, defining, limiting and regulating the powers of the corporation, the directors and the stockholders, or any class of the stockholders, or, in the case of a corporation which is to have no capital stock, of the members of such corporation; provided, such provisions are not contrary to the laws of this state."

I find nothing in the corporation code, or elsewhere in the statutes, precluding the inclusion of provisions restricting alienability of stock as between stockholders in articles of incorporation and I am convinced the portion of the statutory enactment just quoted not only contemplates but authorizes just such restrictions with respect to sales of stock as are found in the instant charter.

That such restrictions when included in the articles of incorporation of any corporation, in jurisdictions where they are not prohibited by statute—to say nothing of jurisdictions in which they are so authorized—are valid and binding as contractual obligations between all the stockholders of a corporation, including purchasers who are chargeable with notice thereof, has long been recognized by the great weight of authority. For legal treatises and other references supporting this conclusion see 12 Fletcher Cyclopedia Corporations (Perm. ed.), 211, § 5453; Christy and McClean, Jr., The Transfer of Stock (2d ed.), 75, § 39; 13 Am. Jur. 411, § 334; 138

A. L. R. Anno. 654 to 657; American Digest System, "Corporations," § 113; 18 C. J. S., 924, § 391(d).

Under the quoted section of the general corporation code and the rule announced in the foregoing decisions I am constrained to conclude Talbott was as much bound by the provisions of the articles of incorporation restricting the sale of stock in the corporation as Nibert and that to succeed in an action, either in law or in equity, which would result in his acquisition of additional stock in the corporation Talbott was required to establish compliance with their requirements. This, as I have heretofore indicated, the trial court found he failed to do. Such conclusion, in my opinion, compels the additional one the majority opinion erroneously holds a decision as to the validity of the charter provisions imposing restrictions upon the sale of the involved stock, or their force and effect, is unnecessary to a proper determination of this appeal. To conclude otherwise would enable two or more stockholders of a corporation, by connivance or otherwise, to nullify contractual charter provisions entered into and agreed upon by the incorporators of a corporation for their mutual benefit.

My view is that the trial court erred in concluding as a matter of law the charter provisions restricting the sale of stock had no application to and did not govern sales of stock by one stockholder (Nibert) to another (Talbott) and, in view of its finding of fact No. 8, also erred in the rendition of the judgment requiring Nibert to endorse his certificates of stock to Talbott and directing the corporation to transfer such stock on the books of the corporation. I would reverse the judgment of the court below and direct it to render judgment denying specific performance of the option agreement.

HARVEY, C. J., and SMITH, J., concur in foregoing dissenting opinion.

HARVEY, C. J. (dissenting): I dissent from the opinion written for the court by Mr. Justice Wedell. I concur in the dissenting opinion of Mr. Justice Parker and wish to add thereto.

As the case reached this court, aside from questioned rulings of the trial court upon controverted testimony, the record presented two principal questions for our determination: *First,* the proper interpretation of our statute pertaining to corporations, particularly G. S. 1947 Supp. 17-2802 and 17-2803, and the charter of the Pabco Drill-

ing Company, Inc., issued thereunder; and, *second*, whether the equities of the case as shown by the record required or justified the trial court's judgment.

Prior to 1939 our ·statutes pertaining to corporations had been enacted from time to time to make effective the particular views of those who drafted the legislation and without much regard to statutes previously enacted.

This resulted in some overlapping and in much omission of appropriate statutory provisions for the organization of corporations and the conduct of their business. As early as 1930 the state bar association appointed a committee of lawyers whose work was largely in connection with corporations to ·write a corporation code. The committee made its first report to the bar association in 1932 (1 J. B. K. 78), a part of which we quote:

"The committee is unanimously of the opinion that the statutes of the State of Kansas having to do with the creation and organization, and the powers and exercise of powers of domestic corporations are so inadequate, uncertain, indefinite and even fragmentary, as to leave the bench and the bar and business advisers often in doubt as to the proper course to be pursued. This fact discourages the creation of Kansas corporations by both citizens of the State of Kansas and by citizens of other states expecting to do business within the State of Kansas, and retards the growth and development and the natural and normal exercise of the powers of business corporations in Kansas."

The report points out the reluctance of people desiring to form corporations to organize them under the laws of Kansas, and treats of the advisability of encouraging the organization of corporations under the laws of this state for the purpose of converting raw materials into finished products, and continues:

"The entire state is concerned in this process of conversion and in encouraging organized capital to enter the state, to organize within the state, and to effect this process of conversion within the state. Your Committee believes that a revision of our corporation laws to meet modern business conditions will help to bring about this process of conversion, will greatly profit the state in general, and will also produce considerable additional revenue for the state by means of the additional fees which normally follow in the wake of a modern and proper corporation code."

The committee prepared a temporary draft of the code, which was introduced in the legislature of 1933, not with the view of its passage at that time but for study, and a thousand copies of it were printed and distributed. Later it was presented to the legislative council. There, after a discussion at several of its sessions, the measure was recommended for passage, with only one dissenting vote.

The bar association had a large number of copies of the proposed code printed and generally distributed in this state, and to some extent outside of the state. The committee continued its consideration of the draft and the many suggestions made to it by interested persons and made such modifications as it deemed appropriate. It was introduced at other sessions, but because of the desire for further study, or other pressing business, was not passed. By 1939 the committee had worked it over so much that they were fully satisfied with its provisions. It was presented early to the legislature in 1939. At the request of the chairman and vice-chairman of the Senate Judiciary committee and of the Speaker of the House of Representatives, Mr. Thomas A. Lee, a member of the committee, furnished them with a memorandum explaining the differences between the corporation code and existing statutes. This has been preserved by being published in 7 J. B. K. 260.

The draft proposed was enacted into law (Laws 1939, ch. 152), and is now G. S. 1947 Supp. 17-2401 to 17-4505. The statute has been in force ten years and appears to have proved to be as beneficial as the committee which formulated it had hoped. Its provisions have been so clear and complete that only a few cases involving it have reached this court, as the annotations to the statutes disclose. This is the first case in which an effort has been made to ignore or render nugatory the sections of the statute here involved—an effort which will be successful if the opinion written by this court stands.

Under the subtitle, "Organization of Private Corporations for Profit," the pertinent sections are quoted or summarized as follows:

17-2801: "Private corporations organized for profit shall be created in accordance with this act."

17-2802: "The articles of incorporation *shall set forth*" (our emphasis). This contains ten subsections lettered from *A* to *J*, inclusive.

17-2803: "The articles of incorporation *may also set forth*" (our emphasis). This is followed by eight subsections lettered from *A* to *H*, inclusive. We are concerned here with subsection *B* only, which reads:

"*B*. Any provision which the incorporators may choose to insert for the management of the business and for the conduct of the affairs of the corporation, and any provisions creating, defining, limiting and regulating the powers of the corporation, the directors or the stockholders, or any class of the stockholders, or in the case of a corporation which is to have no capital

stock, of the members of such corporation; provided, such provisions are not contrary to the laws of this state."

With reference to this section Mr. Lee, in the article mentioned, said:

"In accordance with the contractural theory of corporations which forms the fundamental basis for the Code as drawn, Section 12 *which is entirely new,* provides that the Articles of Incorporation *may set forth* in addition to the requirements of Section II certain additional agreements of the incorporators." (Our emphasis.)

The defendant, Pabco Drilling Company, Inc., filed its articles of incorporation with the secretary of state in July, 1946, as a corporation for profit under the laws of Kansas. It stated all the matter required by G. S. 1947 Supp. 17-2802, and no controversy is presented concerning them. Acting under G. S. 1947 Supp. 17-2803, subdivision *B,* the incorporators wrote into the charter the following:

"Stockholders of record shall have the prior right to purchase any stock offered for sale and any stockholder desiring to sell his stock in said corporation, or any part thereof shall notify the President and Secretary in writing of his desire to sell, the number of shares and the price asked, and the Secretary on receipt of said notice shall immediately notify by registered mail, addressed to the last known address, or the address of record in the stock register, all stockholders of record, and any stockholder or stockholders desiring to purchase same may by exercising such rights purchase their pro rata share of same within 30 days of the date of the notice given by said stockholder to the Secretary, and by depositing with the Secretary the amount of the price thereof, and upon failure of the stockholders or any of them to purchase same within said 30 days, said stockholder shall have the right to sell the same to any person."

None of the other subsections of this section was inserted in the charter. It was therefore improper for the opinion as written for the court to quote and rely on subsections *E* and *F* of this section, since as to this corporation they should be treated as nonexisting.

The opinion as written for the court is not helped by reliance upon *Steele v. Telephone Association,* 95 Kan. 580, 148 Pac. 661. In that case a telephone company had been organized under the general corporation law to do a general telephone business, with a capital stock of $33,000, divided into shares of $35 each. Plaintiff held 225 certificates for one share each issued to stockholders and assigned to him by a formal assignment in writing endorsed on each certificate. He presented them for transfer, and that being refused, he brought an action in mandamus to compel their trans-

fer. At some time subsequent to the organization of the corporation an effort was made to convert it into a coöperative concern by the adoption of what was called a "constitution and bylaws," such as voluntary unincorporated societies are in the habit of using. These contained many restrictions, among them that no person could own more than one share, and he could not own that unless he could be elected by the board of trustees as a member. Plaintiff contended these bylaws were void as to him. This contention was sustained. In this respect the case is much like *Wentworth v. Russell State Bank*, this day decided. It was further held that the bylaws were void because there was no statute which authorized the stockholders to adopt them. Here we are not dealing with bylaws adopted without statutory authority. We are dealing with a charter provision authorized by statute. We may add, also, that the statutes under which that case was decided have long since been repealed and we now have the provisions of the corporation code hereinbefore mentioned which are applicable.

The provision above quoted in the charter of the corporation here in question is not contrary to any law of this state. When agreed upon by the incorporators and incorporated in the charter it became a valid agreement between them, binding upon all of the stockholders. The general authorities supporting this statement are set out in the dissenting opinion of Mr. Justice Parker and need not be repeated here. Such authorities are supported by the decisions of courts throughout the country cited in support of them. One of the purposes of the provision is to prevent private agreements between stockholders to get control of the company, a purpose attempted to be thwarted here. The statute and a valid provision authorized by it to be inserted in the charter should not be rendered nugatory by a decision of this court. Since the corporation code was adopted in 1939 many corporations for profit have been organized under the laws of this state, and more are being organized from time to time. How many of the charters contain provisions similar to the one here in question is not disclosed, but it is the type of provision that many of them may have. To render nugatory this statute and the charter provision would seriously affect every corporation organized in this state in the last ten years where the charter contains a similar provision. This court should hold the charter provision valid and binding upon the plaintiff and all other stockholders of the corporation.

Was judgment for plaintiff justified upon principles of equity? To me it seems clear the answer must be "No." When plaintiff purchased stock in the company he was bound to know the provisions of its charter. That he did know them is demonstrated by letters he later wrote to other stockholders in which he copied the provisions of the charter, but inaccurately claimed to be acting under them. The contract he made with defendant was unauthorized by the provisions of the charter. He paid no consideration for it, not even the one dollar mentioned therein. What is stated in the opinion written for the court pertaining to consideration for that contract reads like a build-up in the nature of a camouflage. He had no authority under the provisions of the charter to give notice to other stockholders of his desire to purchase, or of his supposed contract to purchase. In his unauthorized letters to stockholders he did more than to offer them a chance to purchase part of the stock, but insisted if they did so they pay their proportionate share of the cost of this litigation. This involves more than the amount of money it would take. This restriction in effect required the other stockholders, if they would take any advantage of it, to side with him in an attempt to enforce a contract which, under the charter provision, was unlawful, and under a procedure directly in opposition to the provision in the charter. Much is said in the opinion as written for the court of what plaintiff did for the company. If I correctly understand the record, upon his purchase of the stock he was made president and general manager of the company. He is entitled to credit for what he did for the company in that capacity, but he is not entitled to a halo for performing his duty. It seems to me that he did not come into court with clean hands; that his conduct in dealing with the defendant and other stockholders was unlawful, arbitrary and dominating.

The judgment of the trial court should be reversed with directions to enter judgment for defendant.

PARKER, J., concurs in the foregoing dissenting opinion.