(563 P.2d 1096)
No. 48,188

BARTLETT AND COMPANY, GRAIN, *Appellant,* v. E. O. CURRY, *Appellee.*

Opinion filed April 29, 1977.

*Michael W. Lerner,* of Stinson, Mag, Thomson, McEvers and Fizzell, of Kansas City, Mo., and *Sam. W. G. Lowe,* of Lowe and Willoughby, of Colby, for the appellant.

*Charles A. Sparks, Jr.,* of Sparks, Foust and Vignery, of Goodland, and *J. Ronald Vignery* of the same firm, for the appellee.

Before HARMAN, C.J., ABBOTT and PARKS, JJ.

HARMAN, C.J.: This is an action by a grain company against a farmer for breach of contract for the sale of 60,000 bushels of wheat. Damages were sought in the sum of $74,816.24 for 25,621 bushels not delivered. In trial to the court the farmer prevailed and this appeal ensued.

Many of the facts in the case were not in dispute—a few were. Plaintiff Bartlett and Company, Grain, buys and sells grain. Defendant E. O. Curry is a wheat farmer. On November 26, 1972, these parties entered into two written agreements. Under the first, which is not the subject of this lawsuit, plaintiff agreed to buy and defendant agreed to sell 4,500 bushels of wheat at $1.98 per bushel, delivery to be at plaintiff's elevator at Levant, Kansas. Date of delivery was specified as "December". Under the other contract, which is the subject of this action, plaintiff agreed to buy and defendant agreed to sell 60,000 bushels of wheat at plaintiff's Levant elevator at a price of $2.02. This contract called

for delivery in *"Mar."* A notation on it stated: "Will start delivery in January and February. Will pay storage on early deliver [*sic*]." A printed clause in the contract provided: "If for any reason the total number of bushels is not delivered, the seller agrees to pay the buyer the full market difference on any part not delivered".

Defendant and plaintiff's elevator manager agreed that, because of bad weather, deliveries under the 4,500 bushel contract need not be made in December, 1972, and defendant could commence deliveries when it was possible for him to do so. He started deliveries on this contract in January, 1973, and completed them February 12, 1973. He made deliveries under the 60,000 bushel contract on February 12, 15 and 21 and on March 2, 6, 7, 12, 13, 15 and 16, 1973. These deliveries totaled 16,312 bushels. Plaintiff's elevator manager and defendant testified that after defendant commenced he hauled wheat whenever the elevator would take the wheat. Defendant asserts he was unable to deliver the remainder of the wheat because plaintiff made it impossible to do so. Plaintiff's elevator was shut down on several occasions in February and March and could not take wheat because of a boxcar shortage. Based upon a summary of scale tickets he had received defendant testified that out of thirty-three hauling days between February 8, and March 16, 1973, he was not allowed to haul at all for fifteen days, excluding Sundays. For seven days he was allowed only one or two loads. For eight days, three to seven loads, and for three days, eight to twelve loads were allowed. During February and March defendant and his son had trucks and wheat available so that 3,000 to 3,500 bushels per day could have been delivered.

Plaintiff's elevator manager testified that on March 16 defendant stated he would like to collect the full amount from the government for wheat stored on his farm; government storage payments ended April 30 and to permit defendant to make such collection he agreed that defendant could wait until after May 1 to resume deliveries under the contract. Defendant's testimony was that he never tendered any wheat on the contract after March 17, 1973; that on March 17 the elevator was filled and he was again not allowed to haul; that he asked the manager, "What now?" and was given no answer; further "I'd let the wheat go till the government loan run out and then I'd haul a little more wheat"; he would deliver some more wheat because he needed

the money; that nobody mentioned the contract at that time. Defendant asked the manager about wheat bought and sold on the March option (delivery in March) and was told the wheat had to be in Kansas City by March 20 which was the time that option went off the trading board. The price of wheat on March 21, 1973, was $1.80, or 22¢ below the contract price.

Defendant did deliver seventy-three loads of wheat to plaintiff's elevator during May, totaling 18,067 bushels. Defendant's son took these in at various times in May, the last date being May 21, 1973. Seventy-one of the seventy-three scale tickets delivered to the son contained the abbreviation for the word "contract" upon them. Ledger sheets for these loads were delivered to defendant which indicated the contract price of $2.02. During May, 1973, the market price was "significantly higher". After his last delivery defendant was paid at the contract rate for the entire amount of wheat delivered in May.

So far as defendant was concerned nothing further happened until he was questioned September 14, 1973, by a supervisor for plaintiff as to when he would deliver more wheat. Defendant stated he had no intention of making more wheat deliveries under the contract. Plaintiff served formal demand letters on defendant September 17, 1973. The market price of wheat on the Kansas City board of trade exchange was then around $5.22. Plaintiff's vice-president testified plaintiff did "buy-in" approximately 25,000 bushels of wheat on the morning of September 18, 1973, to cover wheat not delivered by defendant.

Other evidence will be stated in connection with the parties' contentions.

The trial court made the following findings and conclusions:

### "FINDINGS OF FACT

"[1, 2 and 3 relate to the execution of the contract].

"4. The contract itself stated: 'Date of Delivery *Mar.*', which term is indefinite and incomplete as to which day exactly delivery was due; Defendant claims March 17th, and Plaintiff claims March 31. The Court finds March 17th the day of the market futures closing, but finds it immaterial in this case.

"5. That the actual agreement between the parties was that Defendant was to deliver 60,000 bushels of wheat to Plaintiff before the end of March of 1973.

"6. That said 60,000 bushels were not delivered to Plaintiff by Defendant in March 1973.

"7. That Defendant was cut off from delivering wheat to Plaintiff by Plaintiff's own actions, between February 12, 1973, and March 16, 1973, as follows:

"a. Defendant was not allowed by Plaintiff to haul wheat on February 13, 14, 16, 17, 19, 20, 23, 24, 26, 28, March 1, 8, 9, 10, 14;

"b. Defendant was allowed to only haul 1 or 2 loads on February 22, 27, March 3, 5, 13, 16;

"c. Defendant was allowed to only haul between 3 to 7 loads on February 12, March 2, 7, 15.

"8. Plaintiff, on occasion took 'cash wheat' and turned away Defendant's 'contract wheat'.

"9. That Defendant was capable of hauling 12 to 14 loads a day, and could have met the terms of the contract if he had not been shut down by Plaintiff, as found above.

"10. That Defendant's non-performance was excusable by the actions of Plaintiff, which prevented Defendant from full performance.

"11. In March 1973, the contract terminated by its own terms.

"12. That on April 1, 1973, there was no valid contract entered into extending the contract in question.

"13. On March 17, 1973, Defendant stopped hauling wheat and Plaintiff was, or should have been, aware on that date that Defendant had breached the contract by not delivering 60,000 bushels of wheat.

"14. Defendant voluntarily hauled additional wheat in May, for the purpose of obtaining needed storage space on his farm and needed money.

"15. The March 1973, delivery date was made a term of the contract for the convenience of both parties.

"16. Plaintiff had the duty to receive Defendant's wheat at any time during the life of the contract. No legal excuse for the failure of the Plaintiff was shown, and the Court finds there was none.

"CONCLUSIONS OF LAW

"1. Since the Plaintiff was the party privileged to set down in writing the terms of the contract between the parties, said contract should be strictly construed against the Plaintiff and liberally toward the Defendant.

"2. Plaintiff having prevented the Defendant from performing under a contract, cannot then avail himself of the nonperformance which he himself has brought about.

"3. A contract which specifies a period of its duration, terminates on the expiration of such period.

"4. Judgment is hereby entered for the Defendant herein."

Our consideration of plaintiff's numerous points on appeal will be limited to those deemed determinative. Plaintiff complains the court erroneously concluded it had the duty to receive defendant's wheat at any time during the life of the contract. The argument is, it was unreasonable to construe the contract so as to require plaintiff at its country elevator to receive 60,000 bushels of wheat, or any major portion thereof, on any single day. This is not the fair import of the challenged conclusion. Defendant should not have had to anticipate that his deliveries would be shut off as they were after he commenced hauling in February.

His testimony was that he could have hauled twelve or fourteen loads or 3,000 to 3,500 bushels of wheat per day when he and his son had time, trucks and wheat available during the period. It is no answer to argue defendant should have started his deliveries six weeks earlier. Aside from his own testimony about being shut off from deliveries, plaintiff's manager testified he had contracted for more wheat in 1973 than usual; that defendant had cooperated in making deliveries in February and March; that defendant was "limited" from time to time in February and March and was sometimes put on a quota; that during one week when defendant was allowed to deliver only one load of wheat, the elevator took in 799 bushels of wheat either on a cash purchase or storage basis; and that it was impossible for plaintiff to take defendant's wheat by March 20 because the elevator was shut down at various times in February and March. It appears there was an obligation on plaintiff's part to take the wheat when it was offered and available.

*O. A. Talbott & Co. v. Byler*, 217 S.W. 852 (Mo. App. 1920) was an action for damages for the defendant's alleged failure to deliver corn pursuant to a contract calling for delivery on or before December 10, 1917. Defendant attempted to deliver corn before that date but plaintiff's agent told defendant he couldn't take it because he had no room and there were no cars to move it. After December 10 defendant informed the agent the contract was rescinded. Three days later the agent demanded delivery. The court held:

> "As to whether time was of the essence of the contract, it will be observed that the contract specified the corn was to be delivered 'on or before the 10th day of December, 1917.' Of course, if it was to be delivered by that time, the corresponding obligation was on plaintiff to take it within that period. The phrase 'on or before' a certain date in a contract, with reference to the time it is to be performed, limits the time of performance to the date last mentioned if the subject-matter of the contract and the circumstances are such that time may be deemed as of the essence. [Citations] The contract was for the sale and delivery of a commodity the price of which was subject to change and fluctuation on the market, and the contract fixed the time within which delivery and consequent acceptance were to be had. In such cases time is of the essence of the contract, and if the buyer refuses to accept delivery at or within the time designated, the seller is not obliged to deliver after that date [citations]." (p. 853.)

Similarly in *Sharpnack v. Schwertley*, 190 Iowa 1037, 181 N.W. 249, the court held that if a contract for sale of corn called for

inmediate delivery (distinguishable from three months here) the fact that the plaintiff buyer could not get cars enough to enable him to handle it would not excuse performance on his part, and defendant in such case would not be bound to wait indefinitely for plaintiff to be relieved from his handicap of car shortage.

Plaintiff asserts the court erred in holding that it failed to receive defendant's wheat at times during the life of the contract. The argument here is that plaintiff's only so-called failure was to receive every bushel of wheat on every single day defendant might have wanted to deliver it. All the evidence, including plaintiff's manager's admission that it was impossible for the elevator to take defendant's wheat by March 20, supported this finding. Nor did the court err in concluding that generally a contract which specifies the period of its duration terminates on the expiration of such period (17 Am. Jur. 2d, Contracts, Sec. 486, p. 955) and applying that rule here. The contract under any interpretation did not extend beyond March 31, 1973. Its extension is another matter. The court found plaintiff had rendered defendant's performance impossible. ". . . [A] party to a contract cannot prevent performance by another and derive any benefit, or escape any liability, from his own failure to perform a necessary condition" (*Talbott v. Nibert,* 167 Kan. 138, 146, 206 P. 2d 131). The provision for seller's payment of the full market difference for any wheat not delivered would not be triggered by plaintiff's actions rendering such delivery impossible.

Plaintiff contends that for a number of reasons the court erred in holding defendant's performance was excused by plaintiff's actions. It correctly points out defendant has the burden of proof on this issue. The trial court accepted defendant's version as to all disputed factual issues.

Plaintiff says its conduct in spacing the receipt of deliveries did not manifest an intention on its part to treat the contract at an end. The import of plaintiff's contention is not clear but in any event whether plaintiff expected defendant to perform after the time designated in the contract is immaterial since the contract was one where time was of the essence.

Plaintiff argues its conduct in not receiving grain was perfectly acceptable within the context of the custom of the grain industry. Such evidence as there was dealt with conditions during harvest time. Defendant's testimony was that he did not agree to hold off delivery. K.S.A. 84-1-205 (2) provides:

"A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. . . ."

Here the trial court's implicit finding was supported by the evidence.

Plaintiff would take advantage of the reasonableness standard prescribed in K.S.A. 84-2-503 (1) for the delivery and acceptance of goods, as follows:

"(1) Tender of delivery requires that the seller put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable him to take delivery. The manner, time and place for tender are determined by the agreement and this article, and in particular

"(a) tender must be made at a reasonable hour, and if it is of goods they must be kept available for the period reasonably necessary to enable the buyer to take possession; but

"(b) unless otherwise agreed the buyer must furnish facilities reasonably suited to the receipt of the goods."

Subparagraph (b) appears to be determinative here. Plaintiff had bought more wheat than usual. There was nothing further in the testimony compelling the conclusion that the period reasonably necessary for it to take possession of defendant's wheat was the length of time it took plaintiff to accommodate all its sellers at the Levant elevator. Nor was it necessary for defendant to keep his wheat indefinitely when plaintiff lacked facilities to handle all the wheat it undertook to receive.

Plaintiff argues whatever breach that might have occurred on its part must have substantially impaired the value of the entire contract to defendant before he can excuse his default on the balance of the entire contract. The argument is that the contract should be treated as an installment contract under K.S.A. 84-2-612 wherein plaintiff's inability to receive certain installments would constitute nonconformities and that defendant could have delivered the remainder of his wheat during the last fourteen days in March. The statute relied upon deals with nonconformities in goods received and the buyer's remedies and is not applicable. Moreover the point does not appear to have been raised in the trial court. Defendant did testify that because plaintiff did not buy all his wheat he was unable fully to redeem his loan and receive a ten percent storage payment which the government otherwise would have paid.

In one of its principal points plaintiff maintains the trial court's finding that the contract was not validly extended was not supported by substantial evidence. A showing of extension was made out by the testimony of plaintiff's manager plus the fact defendant delivered wheat during May for which he received scale tickets and ledger sheets referring to the contract and eventually received the contract price by lump sum payment. The trial court could have found an extension from this evidence but did not. Defendant stated he hauled this wheat because he needed money and storage space and that his May deliveries involved separate transactions for no set price. He denied he ever agreed to any extension of the contract. Plaintiff asserts this testimony is not credible. However, it is for the trial court to determine the credibility of the witnesses and the facts. The evidence reflects that neither the manager nor defendant mentioned the contract at the March 16 meeting. Defendant stated he needed to haul more wheat and would do so in May. The testimony was that the market price of wheat was significantly higher in May than the contract price. Defendant's last deliveries were on May 22, 1973. The record does not reveal the day by day market prices for wheat during May nor when in May they were significantly higher than the contract price. The whole situation is not as clear as it might be but it cannot be said no reasonable person could take the view adopted by the trial court.

Plaintiff contends the court erred in failing to hold that defendant reinstated the contract by continuing to make deliveries in May without seasonably notifying plaintiff of cancellation. Much of that which has been said respecting defendant's version of events, which the trial court accepted, is applicable. Here again plaintiff relies upon K.S.A. 84-2-612 (3), providing for a buyer's remedies in connection with receipt of nonconforming goods. A seller's acceptance of nonconforming performance cannot be equated to a buyer's acceptance of nonconforming goods as provided therein. Nor are the factual elements requisite to estoppel on defendant's part present here (see *Place v. Place*, 207 Kan. 734, 486 P.2d 1354). Plaintiff may have changed its position to its detriment because of defendant's conduct but this is not plainly demonstrated in the record. In passing it appears singular that after March 16 plaintiff made no demand for wheat under the

contract until September 17, 1973, when the market price had reached about $5.22 per bushel.

Finally, plaintiff asserts the finding that plaintiff was or should have been aware on March 16, 1973, that defendant had breached the contract was not supported by the evidence. Although there was some dispute over the conversation between the elevator manager and defendant on March 16, the former stated he remembered defendant telling him he was not going to haul more wheat. Defendant stopped hauling until his May deliveries. The significance of the finding seems to lie largely in the fact that if defendant breached the contract in March, there was no damage without further special incidental showing because the contract price was then higher than the market price.

The judgment is affirmed.