(124 P.3d 96)
No. 94,308

L. WAYNE DAVIS and DAVIS FARMS, LLC, *Appellants,* v.
KEY GAS CORP. and UNITED ENERGY, INC., *Appellees.*

Opinion filed December 16, 2005.

*Alan C. Goering*, of Goering and Slinkard, of Medicine Lodge, for appellants.

*Gordon B. Stull*, of Stull & Rein, L.L.C., of Pratt, for appellee Key Gas Corp.

Before MCANANY, P.J., GREEN and MARQUARDT, JJ.

GREEN, J.: L. Wayne Davis and Davis Farms, L.L.C. (collectively referred to as Davis) appeal from the trial court's ruling in favor of Key Gas Corp. (Key Gas) on the issue of whether Key Gas was paying proper royalties to Davis under two existing oil and gas leases. Additionally, Davis appeals from the denial of its motion for amended findings of fact and conclusions of law. The question on appeal is whether Key Gas was required to pay Davis' portion of the transportation costs and other expenses deducted under a gas purchase agreement that Key Gas had entered into with ONEOK Midstream Gas Supply, L.L.C. (ONEOK). The oil and gas leases contain a condition precedent requiring Key Gas to charge transportation costs and other expenses to the leases before Key Gas became liable for these expenses. Because the costs in question were not charged to the leases that exist between Key Gas and

Davis but rather were deducted by ONEOK from the amount given to Key Gas by ONEOK for gas purchased, the condition precedent which would trigger Key Gas' liability for these costs was never fulfilled.

Nevertheless, Key Gas, which had control of this condition precedent under the oil and gas leases, had an implied obligation to protect Davis against transportation costs and other expenses that would reduce Davis' royalty. Key Gas made the completion of the condition impossible when it entered into the gas purchase agreement with ONEOK and allowed ONEOK to deduct transportation costs and other expenses. Key Gas will not be allowed to use its own action which prevented the condition precedent from being fulfilled to escape liability for these costs. Accordingly, we reverse and remand with directions.

In February 2003, L. Wayne Davis and his wife, Betty Davis, granted two oil and gas leases to Thomas Energy, Inc. Under the leases, Thomas Energy, Inc. agreed to pay the Davises (as lessors) a royalty of one-eighth of the proceeds received from "the sale of gas, gas condensate, gas distillate, casinghead gas, gas used for the manufacture of gasoline, or any other product and all other gases, including their constituent parts, produced from the land herein leased." Both of these leases contain the same Exhibit A attachment. Paragraph 9 of Exhibit A includes the following language:

"It is agreed that the Lessor shall bear no costs of gas treatment, dehydration, compression, transportation or water hauling charged to this lease by Lessee in its operations thereon. It is further agreed that Lessor shall receive their proportionate royalty share of all monies received by Lessee for oil and/or gas production attributable to this lease[,] including any premiums, rebates and refunds of any kind or nature paid to Lessee and any take-or-pay payments, production payments, contract buy outs or contract buy downs, which directly reduce the amount of royalty revenue Lessor would otherwise receive from oil and/or gas production from this lease."

Thomas Energy, Inc. assigned these leases to Key Gas. Thereafter, Key Gas filed a "Declaration of Pooling and Unitization," which consolidated part of the land covered by the two leases into one 160-acre operating unit.

Key Gas later entered into a gas purchase agreement with ONEOK, in which ONEOK contracted to purchase natural gas from Key Gas and for the right to process and extract natural gas liquids from the gas. Exhibit A of the contract sets the amount that ONEOK would pay Key Gas at 98% of the price set forth in a specified industry index. In addition, the contract allows ONEOK to charge Key Gas various fees, including a fee for the volume of gas lost and unaccountable, a compression fee, a compression fuel fee, a gathering fee, a dehydration fee, a treating fee, and a conditioning service fee. ONEOK deducted the applicable fees from the amount owed to Key Gas under the contract and then remitted a check for the net amount to Key Gas. Key Gas or one of its related companies would then send Davis a check for the one-eighth royalty share less the proportionate deductions made by ONEOK.

In July 2004, Davis filed suit against Key Gas and United Energy, Inc. United Energy, Inc. owned a working interest in the oil and gas leases. In its petition, Davis raised numerous issues, including that Key Gas was deducting from Davis' royalty checks charges for transportation of gas which were expressly prohibited under the oil and gas leases. In January 2005, the parties stipulated that the only remaining issue before the trial court was "whether the Defendant, Key Gas Corp., is required to pay to the Lessor its proportionate share of deductions from gas proceeds charged by ONEOK as to 100% of the proceeds." The parties entered into a settlement agreement as to all other issues raised in Davis' petition, including any claims raised against United Energy, Inc.

The trial court decided the remaining issue based on the briefs and documentation submitted by the parties. In its brief, Davis argued that the unambiguous language contained in paragraph 9 of Exhibit A of the leases prohibited deductions from Davis' royalties. Davis pointed out, however, that the contract between Key Gas and ONEOK allowed a deduction of 7.5% of gross royalty for transportation charges. Davis argued that Key Gas could not contract the authorization to make deductions and then disclaim responsibility. Davis contended that Key Gas was fulfilling its marketing responsibilities, which was part of its operations on the lease, when it contracted for the sale of gas to ONEOK. Davis maintained

that by authorizing the deductions against Davis' royalty share, Key Gas breached the terms of the oil and gas leases.

On the other hand, Key Gas argued that it was paying appropriate royalties to Davis. Key Gas maintained that the deductions were made under the ONEOK contract and were not charges made by Key Gas under its leases with Davis. Key Gas contended that it made no other deductions from the ONEOK payment and that it was paying Davis the proportionate share of the actual proceeds received. It appears that Key Gas never disputed that the types of costs and expenses deducted by ONEOK were those listed in paragraph 9 of Exhibit A of the oil and gas leases.

In its memorandum decision issued in February 2005, the trial court entered judgment in favor of Key Gas. In doing so, the trial court referenced a particular case originally decided by it, see *Sternberger v. Marathon Oil Co.*, 257 Kan. 315, 324-32, 894 P.2d 788 (1995), and indicated its concern in that case had been about "the opportunity for an unscrupulous operator to self-deal through a controlled entity or arbitrarily make charges for services beyond their real economic value." The trial court further stated:

"In this instance, the exhibit to the lease form prohibits charging the lessors share for costs of this nature incurred by the lessee.

"The difficulty is that the industry has changed as noted in the Sternberger opinion that instead of gas pipeline companies building line to the wellhead with the purchase price reflective of the cost of bringing the pipeline to the well, the present market involves taking the gas from the wellhead to a point off the leased premises before the first sale takes place.

"In this instance, the price is determined by a published standard for gas delivered to a major cross-country pipeline. The first purchaser assumes the cost of getting the gas from the point of first purchase to its point of second purchase whether it is a major interstate pipeline or an end user of a local or regional nature. The contract between ONEOK and Key Gas starts with a distant, premium floating market as the price and then makes certain deductions based on a percentage basis of sales price or a flat rate per MMBTU to compute the proceeds payable to Key. Key apparently then pays one-eighth of its proceeds to the plaintiffs.

"The Court would conclude there is absolutely no suggestion of collusion between ONEOK and Key Gas. This self-dealing which troubled the trial court in the Sternberger [decision] is not present here.

"The defendants are apparently paying all of the costs of getting the gas to the point of first purchase. If the deductions from the distant premium market value

made by ONEOK are for expenses incurred prior to delivery to ONEOK, the record before the court fails to so indicate."

The trial court further noted that there had not been a trial with evidence presented that Key Gas paid the expense of delivering the gas to the first purchase point. The trial court stated that if it was wrong in its assumption that Key Gas was paying these expenses, then the attorney for Davis should move for reconsideration and to reopen the record to present testimony. The trial court then concluded:

"If the Court is in fact correct that the pricing system actually reflects a distant floating price with deductions negotiated in good faith by unrelated entities that compensates ONEOK for maintaining its transportation and administrative network from point of first purchase to a point of second purchase, then judgment is entered in favor of the defendants."

After the trial court's decision was entered, Davis moved for amended findings of fact and conclusions of law. Davis argued that the issue was not whether there had been collusion between Key Gas and ONEOK. Davis maintained that the *Sternberger* decision was only relevant to demonstrate why Davis wanted paragraph 9 of Exhibit A incorporated into the leases, which was to protect Davis from losing substantial royalty revenues for charges and fees over which Davis had no control. The trial court denied Davis' motion for amended findings of fact and conclusions of law.

The question in this case is whether under the oil and gas leases Key Gas was required to calculate Davis' royalties based on an amount that did not include the transportation costs and other expenses charged by ONEOK. Stated another way, was Key Gas required to assume liability for Davis' portion of the deductions made by ONEOK?

Generally, when reviewing a trial court's factual findings and legal conclusions, an appellate court must determine whether the findings of fact are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. *U.S.D. No. 233 v. Kansas Ass'n of American Educators*, 275 Kan. 313, 318, 64 P.3d 372 (2003). An appellate

court's review of conclusions of law is unlimited. *Nicholas v. Nicholas*, 277 Kan. 171, 177, 83 P.3d 214 (2004).

In this case, however, the trial court made its determination based on the briefs and accompanying documents submitted by the parties. Therefore, this court's standard of appellate review is de novo. "Where the controlling facts are based solely on written or documentary evidence, an appellate court may determine de novo what the facts establish. [Citation omitted.]" *Telegram Publishing Co. v. Kansas Dept. of Transportation*, 275 Kan. 779, 784; 69 P.3d 578 (2003).

Moreover, in addressing the issue on appeal, this court is required to interpret the oil and gas leases that existed between Key Gas and Davis. "The interpretation and legal effect of written instruments are matters of law, and an appellate court exercises unlimited review. Regardless of the construction given a written contract by the trial court, an appellate court may construe a written contract and determine its legal effect. [Citation omitted.]" *Unrau v. Kidron Bethel Retirement Services, Inc.*, 271 Kan. 743, 763, 27 P.3d 1 (2001).

The rules governing the construction of oil and gas leases are well established and follow the rules for construction of contracts generally:

"The intent of the parties is the primary question; the meaning should be ascertained by examining the document from all four corners and by considering all of the pertinent provisions, rather than by critical analysis of a single or isolated provision; reasonable rather than unreasonable interpretations are favored; a practical and equitable construction must be given to ambiguous terms; and any ambiguities in a lease should be construed in favor of the lessor and against the lessee, since it is the lessee who usually provides the lease form or dictates the terms thereof." *Hall v. JFW, Inc.*, 20 Kan. App. 2d 845, Syl. ¶ 2, 893 P.2d 837, *rev. denied* 257 Kan. 1092 (1995).

Neither Davis nor Key Gas alleges that the leases are ambiguous. As a result, in determining the intent of the parties, we look solely to the four corners of the leases and harmonize the language therein if possible. Unambiguous contracts are enforced according to their plain, general, and common meaning in order to ensure that the parties' intentions are enforced. *Bunnell Farms Co. v. Sam-*

*uel Gary, Jr. & Assocs.*, 30 Kan. App. 2d 739, Syl. ¶ 2, 47 P.3d 804 (2002).

Davis argues that the royalties paid to it by Key Gas are contrary to the express terms of paragraph 9 of Exhibit A. The critical provision in this case is contained in paragraph 9 of Exhibit A and states: "It is agreed that the Lessor shall bear no costs of gas treatment, dehydration, compression, transportation or water hauling charged to this lease by Lessee in its operations thereon." Under this provision, Key Gas, not Davis, became responsible for the costs that were charged to the leases by Key Gas "in its operations thereon." Thus, in order for Key Gas to assume the liability for these charges, Key Gas needed to charge these expenses to the leases. The requirement that Key Gas charge the expenses to the leases appears to be an express condition precedent to Key Gas' liability for the charges. A "condition precedent" is "[a]n act or event, other than a lapse of time, that must exist or occur before a duty to perform something promised occurs." Black's Law Dictionary 312 (8th ed. 2004). Because the condition that Key Gas charge the expenses to the leases was never fulfilled, Key Gas never became liable upon its contractual promise. Therefore, it appears that the lease provision contained in paragraph 9 of exhibit A does not require Key Gas to assume liability for Davis' portion of the deductions charged by ONEOK.

The provision of the oil and gas leases which pertains to the payment of royalties is paragraph 4 of the main lease. This provision states in pertinent part that "[t]he lessee shall pay to the lessor, as a royalty, one-eighth (⅛th) of the proceeds received by the lessee from the sale of gas, gas condensate, gas distillate, casinghead gas, gas used for the manufacture of gasoline or any other product, and all other gases, including their constituent parts, produced from the land herein leased." The express terms of this provision indicate that Davis was entitled to a one-eighth royalty of the proceeds received by Key Gas from the sale of gas.

Davis concedes that if this provision was unchanged by Exhibit A of the oil and gas leases, it would have the same effect as the decision in *Sternberger*, 257 Kan. at 324, where our Supreme Court stated: "[W]here royalties are based on market price 'at the

well,' or where the lessor receives his or her share of the oil or gas 'at the well,' the lessor must bear a proportionate share of the expenses in transporting the gas or oil to a distant market." Moreover, our Supreme Court has stated that "[w]here a lease calls for royalties based on the 'proceeds' from the sale of gas, the term 'proceeds' means the money obtained from an actual sale and lawfully retained by the seller." *Lightcap v. Mobil Oil Corporation*, 221 Kan. 448, Syl. ¶ 5, 562 P.2d 1, *cert. denied* 434 U.S. 876 (1977).

Here, Key Gas paid to Davis a one-eighth royalty based on the proceeds it actually received from ONEOK for the sale of gas. The proceeds received from ONEOK was net of the deductions charged for transportation costs and other expenses under the contract between ONEOK and Key Gas. Under paragraph 4 of the oil and gas leases, these royalty payments to Davis appear to be proper.

Nevertheless, Davis argues that Key Gas may not escape liability by contracting with a third party to deduct charges which are prohibited by the oil and gas leases. To support its position that Key Gas cannot charge the deductions against Davis' royalty share, Davis attempts to analogize the instant situation to the construction of a new home. Citing *Ekstrom United Supply Co. v. Ash Grove Lime & Portland Cement Co.*, 194 Kan. 634, 400 P.2d 707 (1965), Davis asserts that a contractor is liable to a homeowner for a subcontractor's use of materials not allowed under the contract. Nevertheless, *Ekstrom* provides no support for Davis' statements. The *Ekstrom* case involved whether a corporate claimant had properly verified a mechanics' lien statement under the applicable statute.

Davis further argues that prohibited acts may not be assigned to avoid liability and points to paragraph 16 of the oil and gas leases which states that "[t]his lease and all its terms, conditions, and stipulations shall extend to and be binding on all successors of said lessor and lessee." Here, however, Key Gas did not assign the oil and gas leases to ONEOK. The gas purchase contract between ONEOK and Key Gas was an agreement independent from the oil and gas leases between Davis and Key Gas. There is nothing in the record to indicate that ONEOK took over the working interest under the oil and gas leases between Key Gas and Davis.

Nevertheless, this does not mean that Davis is left without a remedy. Where the other party to a contract prevents or hinders fulfillment of a condition, that party cannot be heard to complain of its nonperformance since it is due to its own fault. See Restatement (First) of Contracts § 295 (1932); *Baker Farms v. LDS Corp.*, 136 Idaho 922, 42 P.3d 715 (Ct. App. 2002). This court should then consider the question: Did Key Gas frustrate the performance of its condition for liability (that it charge the costs of transporting the gas to the lease) in a way not contemplated or authorized by the leases? Because the intent of the parties governs, this court should consider the parties' intent.

Importantly, it appears that the trial court never ascertained the parties' intent under the oil and gas leases. Rather, the trial court seemed to focus on the fact that there was no evidence of collusion between Key Gas and ONEOK and that the deductions made by ONEOK were incurred after Key Gas delivered the gas to ONEOK. The trial court discussed the current state of the market and the practice of taking gas from the wellhead to the point of first sale. This discussion seemed to relate to trade usage and custom, which can be used for certain purposes in contract interpretation:

"The proper office of trade usage or custom is to explain technical terms in contracts to which peculiar meanings attach; to make certain that which is indefinite, ambiguous or obscure; to supply necessary matters upon which the contract itself is silent; and generally to elucidate the intention of the parties when the meaning of the contract cannot be clearly ascertained from the language employed. [Citations omitted.]" *Branner v. Crooks*, 6 Kan. App. 2d 813, 815, 635 P.2d 1265 (1981).

Nevertheless, our Supreme Court has made clear that when one party seeks to establish trade custom and usage, it must be shown that the other party knew of the custom or that the knowledge among those in the business or industry was so notorious as to provide a presumption that the other party knew of it. *Wendling v. Puls*, 227 Kan. 780, Syl. ¶ 4, 610 P.2d 580 (1980). Furthermore, trade custom and usage must be established with clear and convincing evidence. 227 Kan. 780, Syl. ¶ 4. Here, there is no evidence in the record supporting the trial court's statements relating to the

738

trade customs and usage in the oil and gas industry. There is nothing in the record indicating that either party came forward with this type of evidence. Moreover, the record fails to establish that Davis had knowledge of the particular trade custom and usage discussed by the trial court or that the knowledge among those involved in the oil and gas industry was so notorious as to create a presumption that Davis had knowledge of this trade custom and usage. Based on this lack of evidence in the record, we determine that trade custom and usage should not be used to establish the parties' intent under the leases.

*Intent*

As discussed above, we ascertain the parties' intent from the four corners of an unambiguous instrument, harmonizing the language therein if possible. Moreover, we enforce an unambiguous instrument according to its plain, general, and common meaning in order to ensure that the parties' intentions are enforced. See *Bunnell Farms Co.*, 30 Kan. App. 2d 739, Syl. ¶ 2.

There can be little doubt that under the first sentence contained in paragraph 9 of Exhibit A of the oil and gas leases, it was the intention of the parties that Davis would "bear no costs" for transportation of gas and the other listed expenses charged to the leases by Key Gas. Moreover, under the second sentence of paragraph 9 of Exhibit A, it was the intention of the parties that Key Gas would base Davis' royalties on the payments received for oil and gas production under the leases, which included any payments that were disguised as something other than oil and gas production payments. The second sentence of paragraph 9 of Exhibit A states:

"It is further agreed that Lessor shall receive their proportionate royalty share of all monies received by Lessee for oil and/or gas production attributable to this lease[,] including any premiums, rebates and refunds of any kind or nature paid to Lessee and any take-or-pay payments, production payments, contract buy outs or contract buy downs, which directly reduce the amount of royalty revenue Lessor would otherwise receive from oil and/or gas production from this lease."

When harmonizing the language contained in paragraph 9 of Exhibit A, it appears that the parties intended for Key Gas to refrain from reducing the amount of any royalty revenues that Davis

was entitled to receive contrary to the provisions of the leases. This included Key Gas protecting Davis from the costs of gas treatment, dehydration, compression, transportation, and water hauling. Such being the case, the question arises whether Key Gas became obligated to pay Davis its share of the costs charged by ONEOK.

Key Gas argues that the condition qualifying its liability for the costs required, according to the lease provisions, that Key Gas charge these costs to the leases. Key Gas further argues that because it never deducted these costs under the leases, it did not breach the lease provisions. Nevertheless, Key Gas, by its voluntary act of signing the contract with ONEOK, surrendered control of the transportation costs and other expenses. Its execution of the contract with ONEOK made it impossible for Key Gas to charge the costs to the leases.

It is well settled that a party cannot avoid liability for the nonperformance of an obligation by placing such performance beyond its control by its own voluntary act. It is stated in 8 Corbin on Contracts § 40.17, pp. 580-81 (1999):

"One who unjustly prevents the performance or the happening of a condition of promissory duty thereby eliminates it as a condition. Thus that party cannot escape liability by preventing the happening of the condition on which it was promised."

The same rule is stated in 13 Williston on Contracts § 39:6, pp. 528-29 (4th ed. 2000): "It is a principle of fundamental justice that if a promisor is personally the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends, the promisor cannot take advantage of the failure." This rule applies to all types of conditions, *i.e.*, express or implied, precedent or subsequent. See Restatement (First) of Contracts § 315 (1932).

In *Gulf Oil Corporation v. American Louisiana Pipe Line Co.*, 282 F.2d 401, 404 (6th Cir. 1960), the court stated: "Where liability under a contract depends upon a condition precedent one cannot avoid his liability by making the performance of the condition precedent impossible, or by preventing it. [Citations omitted.]" Accord *Foster v. Colorado Radio Corporation*, 381 F.2d 222, 224 (10th

Cir. 1967); *Spanos v. Skouras Theatres Corporation*, 364 F.2d 161, 169 (2nd Cir.), *cert. denied* 385 U.S. 987 (1966); *Omaha Public Power District v. Employers Fire Insurance Co.*, 327 F.2d 912, 916 (8th Cir. 1964); *Amies v. Wesnofske*, 255 N.Y. 156, 162-63, 174 N.E. 436 (1931); *Bradford Dyeing v. J. Stog Tech GMBH*, 765 A.2d 1226, 1237-38 (R. I. 2001). Therefore, prevention or hindrance will excuse fulfillment of a condition precedent.

Here, Key Gas made the performance of its condition qualifying its liability (that Key Gas charge the costs of transporting the gas to the lease) impossible when it executed the contract with ONEOK. "When the occurrence of a *condition* is largely or exclusively within the control of one party, so that the party is largely or totally dependent on the party within whose control the *conditioning* event lies, the express language of the *condition* often gives rise to an implied *promise*." (Emphasis added.) *Baker Farms*, 136 Idaho at 926. Moreover, "[a] party to a contract will not be permitted to derive any benefit, or escape any liability, by his own failure to perform a necessary condition which prevents the completion of the transaction." *Talbott v. Nibert*, 167 Kan. 138, Syl. ¶ 4, 206 P.2d 131 (1949).

Our Supreme Court in *Talbott* was faced with the argument that a party to a contract should be excused from compliance with the contract when a condition has not been satisfied. There, Talbott brought an equitable action to compel Nibert to comply with an option contract for the sale of Nibert's stock to Talbott. Nibert argued that he was not required to comply with the contract because a condition under the corporate charter requiring that a notice of the sale of stock to Talbott be given to the other stockholders of the corporation had not been fulfilled. Nibert had failed to give such a notice. The trial court entered judgment in favor of Talbott, enforcing the option contract. On appeal, our Supreme Court stated that the only duty remaining for Talbott to complete the option contract if Nibert had given notice to stockholders would have been to pay for the shares of stock. Nevertheless, Nibert had made it impossible for Talbott to complete the option contract according to the corporate charter, which required notice to stockholders. Recognizing that Nibert had control of the condition, our

Supreme Court determined that Nibert could not be allowed to use his own default which had prevented the transaction from being completed as a defense. 167 Kan. at 145-46.

Here, Key Gas was in control of the condition requiring the transportation costs and other expenses to be charged to the leases. Key Gas' conduct of entering into the contract allowing ONEOK to deduct costs prevented the completion of the condition. Moreover, at the time Key Gas entered into the contract with ONEOK, Key Gas had received Davis' performance. Their leases had become unilateral in effect because Davis had fully performed its part of the leases. Having received Davis' performance, Key Gas had an implied obligation to perform the act upon which its liability was conditioned. A simple case will illustrate this point.

In *Brackett v. Knowlton*, 109 Me. 43, 82 A. 436 (1912), the plaintiff, James W. Brackett, signed an advertising contract with Jeremiah B. Knowlton to place an ad in Brackett's newspaper for the sale of Knowlton's soda and sulphur springs. Knowlton promised to pay for the ad when he "sold the springs." Knowlton prevented the condition by making a gift of the springs to his grandchildren. In determining that Knowlton's prevention was improper and excusing the condition, the court stated: "By the conveyance to his grandchildren by way of gift, the testator made impossible the occurrence of either of the contingencies, and his liability at once accrued. [Citations omitted.]" 109 Me. at 45.

Here, prevention excuses the condition qualifying Key Gas' liability, and Key Gas' implied promise becomes absolute. Having prevented the performance of its condition precedent by entering into a contract whereby ONEOK could make the deductions for gas transportation costs and other expenses before tendering the proceeds from the sale of gas to Key Gas, Key Gas will not be permitted to deny liability under paragraph 9 of Exhibit A of the leases.

The case of *Foster*, 381 F.2d 222, illustrates that a party to a contract who has control over a condition precedent must exercise reasonable diligence in causing such condition to occur. There, Colorado Radio Corporation sued Foster for damages resulting from an alleged breach of her promise to purchase certain assets

of a New Mexico radio station. A provision to the contract between Foster and Colorado Radio Corporation required Foster to make satisfactory arrangements for the payment of two notes that she was supposed to assume. The lower court ruled in favor of Colorado Radio Corporation, finding in part that the contract provision in question created a condition precedent to Foster's duty to purchase. Foster's argument was that there could be no breach because satisfactory arrangements had not been made. In rejecting Foster's argument, the Tenth Circuit Court of Appeals stated: "We think it sufficient to say that the responsibility for making arrangements was placed by the contract on Mrs. Foster, and that with respect to one of the notes the evidence falls far short of showing a reasonably diligent effort on her part to make arrangements." 381 F.2d at 224. See also *Dengler v. Hazel Blessinger Family Trust*, 141 Idaho 123, 128, 106 P.3d 449, 454 (2005) ("Where a party has control over the happening of a condition precedent he must make a reasonable effort to cause the condition to happen.").

Here, Key Gas had control over its condition precedent requiring it to charge transportation costs and other listed expenses to the oil and gas leases before it became liable for Davis' portion of these costs. When Key Gas entered into the gas purchase agreement with ONEOK, it had the responsibility under the oil and gas leases to protect Davis against transportation costs and expenses that would reduce Davis' royalties. There is no evidence in this case that Key Gas used reasonable diligence to retain control of these costs and charge them to the oil and gas leases, thereby protecting Davis from these costs. A party may not raise nonperformance of a condition as a bar to liability where its own action is the cause of the nonperformance. See *Gibbs v. Whelan*, 56 N.M. 38, 41-42, 239 P.2d 727 (1952). Key Gas will not be allowed to use its own action which prevented its condition precedent from being fulfilled to escape liability for the costs.

Reversed and remanded with directions that Davis recover from Key Gas the amount charged by ONEOK for gas treatment, dehydration, compression, transportation or water hauling, plus interest.

MCANANY, J., dissenting: It seems to me that the majority has lost its way by needlessly, but with great effort, following a rather confusing and convoluted trail through frustration of performance, trade usage and custom, and condition precedent. I believe that none of these doctrines applies under the facts of this case. Without dwelling on the various reasons these doctrines do not apply, I would rather cut to the chase.

Upon settling almost all their differences, the parties asked the district court to interpret the first sentence of paragraph 9 of Exhibit A which was incorporated into the two oil and gas leases. That sentence states: "It is agreed that the Lessor shall bear no cost of gas treatment, dehydration, compression, transportation or water hauling charged to this lease by Lessee in its operations thereon." The district court was not asked to consider this sentence in a vacuum but together with the context of the provisions of a gas purchase agreement between Key Gas as seller and ONEOK as buyer. The district court had before it both the leases and the gas purchase agreement. The contested lease provision relates to transportation charges "charged to the lease in its operations thereon." What does that mean?

As a part of its operations on the leasehold, Key Gas laid a gas line across the Davis property as it was entitled to do under the leases. (In fact, one of Davis' complaints was the manner in which Key Gas laid this line.) Davis did not contest Key Gas' assertion to the district court that Davis was not charged for any expenses in connection with this gathering line. This is not surprising. Key Gas could not charge Davis for any of this expense since it related to Key Gas' transportation expenses on the leases, *i.e.*, "in its operations *thereon*." (Emphasis added.)

Ten months after the more recent Davis lease, Key Gas entered into the gas purchase agreement with ONEOK. The agreement requires Key Gas to deliver gas from the Davis wells to ONEOK's receipt point. Key Gas is responsible for the installation of all facilities upstream of the receipt point. All the upstream facilities are owned by Key Gas and operated at its sole expense. The receipt point is defined as "the inlet flange of BUYER's pipeline facilities installed to take deliveries of Gas from SELLER."

Exhibit A incorporated into the gas purchase agreement spells out the method for computing the purchase price for gas delivered from the Davis leases. That price is computed from a monthly industry publication that identifies prices for spot gas delivered to Panhandle Eastern Pipeline Co.'s Texas-Oklahoma mainline. The price is reduced by a charge for "Transportation and Fractionation." This relates to transportation of the gas *after* ONEOK has received it *downstream* from the gathering line which is owned and operated by Key Gas at a cost in which Davis does not share.

We are confronted here with what seems to me to be a rather straight-forward situation. Davis and Key Gas agree that Davis will not be responsible for transportation costs associated with operations on the leasehold premises. Key Gas honored this by constructing and maintaining at its sole cost the gathering line from the wellheads that ran across Davis' property. The transportation charges at issue here are not associated with that gathering system but rather transportation expenses incurred *downstream* from the inlet flange on ONEOK's system. These charges were not incurred in Key Gas' operations *on* the leases.

Davis does not complain that the terms of the gas purchase agreement were in any way suspect, unusual, or contrary to the customary way gas is sold on the open market. The district court correctly found that the purchase price for the gas was the product of an arms-length transaction between Key Gas and ONEOK without any collusion whatsoever. It is not in the least bit surprising that gas in a processing plant has a greater value to the buyer than gas delivered to the buyer a great distance from the plant. ONEOK's recognition of this obvious fact is reflected in its computation of the price of gas when it leaves the Davis leases. ONEOK is in the business of buying gas, not merely transporting it by way of a pipeline for a fee. The transportation charge included in the price calculation is a method of establishing the market value of the gas at ONEOK's inlet flange rather than at a more distant point where ONEOK resells it to the next purchaser in the line of commerce.

Davis' argument, and the majority's conclusion today, is that there really is a free lunch. Davis seeks, and the majority gives, a

royalty based upon the value of gas from the well at an inflated price that ignores the realities of the market that affect price *after* the gas has left Davis' leased property.

I would affirm the sound and common-sense decision of the district court. For this reason, I respectfully dissent.